```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
                                         :    16cv4414 (DLC)
U.S. SPECIALITY INSURANCE COMPANY,       :
                                         :    OPINION AND ORDER
                    Plaintiff,           :
                                         :
          -v-                            :
                                         :
CATALENT, INC.,                          :
                    Defendant.           :
                                         :
---------------------------------------- X
```

APPEARANCES:

For the Plaintiff:

Jeffrey S. Weinstein
Emilie Bakal-Caplan
Sara F. Lilling
Mound Cotton Wollan & Greengrass LLP
One New York Plaza, 44th Floor
New York, NY 10004-1486

For the Defendant:

Elizabeth A. Edmondson
Jenner & Block LLP
919 Third Avenue
New York, NY 10022-3908

John H. Mathias, Jr.
David M. Kroeger
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654

DENISE COTE, District Judge:

    This declaratory judgment action arises out of an insurance claim filed by the defendant Catalent, Inc. ("Catalent") for financial losses it sustained during a government-mandated suspension of manufacturing at Catalent's softgel manufacturing facility in Beinheim, France.  A five month suspension of

operations followed the discovery of softgel capsules "out-of-place" in the manufacturing facility.  U.S. Specialty Insurance Company ("USSIC") denied coverage and filed the instant action seeking a declaration that there is no coverage under the insurance policy (the "Policy").

The parties have cross-moved under Rule 12(c) for judgment on the pleadings based on their competing readings of the Policy terms.  They agree that the financial damage to Catalent caused by the suspension of manufacturing is not a defined "LOSS" under the Policy.  Catalent, however, proffers several arguments in favor of finding coverage.  For the reasons that follow, USSIC's motion is granted.

## Background

USSIC issued a "Special Coverages Policy" to Catalent effective June 9, 2014 to June 30, 2017.  On January 4, 2016, Catalent submitted an initial notification of a claim under the Policy for business interruption losses.

Events Leading to Suspension of Operations

Between January and October of 2015,[1] Catalent's

---

[1] The parties disagree in their pleadings as to the exact timeline during which the "out-of-place" capsules were discovered.  USSIC alleges several instances between January and November 2015 based on a report from the National Agency for the Safety of Medicines and Health Products.  Catalent alleges that it discovered several instances of "out-of-place" capsules on or about July 2015 and October 2015.

2

manufacturing facility in Beinhem, France detected several instances of "out-of-place" capsules during the execution of its quality control procedures,[2] including incidents in which a capsule from one batch of product was found in another product batch, as well as instances of capsules found on an empty shelf or the floor.  In particular, Andriol capsules,[3] which are normally processed on a dedicated line, were found in groupings of other capsules.  Catalent concluded that the incidents could be due to deliberate, malicious acts.  Because of the contaminations, the National Agency for the Safety of Medicines and Health Products ("ANSM"), the primary French pharmaceutical regulatory agency, suspended operations at Catalent's manufacturing facility on November 13, 2015.

The parties disagree as to whether ANSM concluded that these contaminations <u>could be</u> considered malicious in nature or <u>were</u> malicious in nature.  The person or persons that may have caused the contaminations have not been identified.  ANSM lifted the suspension on manufacturing on April 28, 2016.

Catalent sustained losses in excess of $10,000,000 related to the five-month suspension in manufacturing.  Catalent never

---

[2] The "out-of-place" capsules were removed prior to distribution.

[3] Andriol is the brand name for a drug used to replace testosterone in males who have conditions caused by low testosterone levels.

received a written or oral demand for money related to the contamination and admits that it has not identified a "sum of monies or the monetary value of any other consideration surrendered by or on behalf of the INSURED as an extortion payment" arising from these events.

The Policy

The Policy is organized into three sections. Section I includes a Declarations page and several endorsements that add coverage to the Policy. The Declarations page states that "insurance afforded is only with respect to such of the hazard parts and coverages indicated below." Below is listed: "Hazard Applicable: 1, 2, 3, 4." The "Limit of Liability" for "Each Loss" is $10,000,000. Section I also contains Endorsements 5 & 6, which amend Section III, paragraph 6, and are described below.

Section II, titled "LOSS DEFINED AND SCOPE OF COVERAGE," begins with a preamble:

> The Company hereby agrees, subject to the terms, limitations and conditions set forth herein, to indemnify the Named Insured specified in Item 1 of the Declarations for LOSS (as hereinafter defined):

Section II then sets out descriptions of Hazards 1, 2, and 3, which are for "Kidnap/Ransom," "Extortion Bodily Injury," and "Detention," respectively. The following paragraph defines "LOSS" for Hazards 1 and 2, and separately for Hazard 3.[4] The

---

[4] The subsection titled "DEFINITION OF LOSS" reads "[f]or the

next page, titled "EXTORTION PROPERTY DAMAGE," sets out Hazard 4. It is Hazard 4 that is at issue here.

Hazard 4 covers extortion payments.  It reads:

**DESCRIPTION OF HAZARD 4**

**Hazard 4. Extortion Property Damage:**

by reason of the receipt of a threat, communicated directly or indirectly to the INSURED to cause physical damage or loss to PROPERTY,[5] including:

(1)   the pollution, contamination or alteration of stock and/or raw materials and/or finished goods, or

. . .

(4)   the production of publicity that the Named Insured's products will be or have been contaminated, polluted or altered by persons who demand payment as a condition for not carrying out such a threat;

provided always that:

    (b)   such threat is first made during the period of this Policy, and

    (c)   the threat is made specifically against the INSURED and

    (d)   at the time of the threat, <u>such money or other consideration</u> is not being carried by,

---

purpose of Hazard 1 and 2, LOSS means the sum of monies or the monetary value of any other consideration surrendered by, or on behalf of the INSURED as a ransom or extortion payment arising from one event or connected series of events involving one or more Insured Persons, RELATIVES OR GUESTS.  For the purpose of Hazard 3, LOSS means the SALARIES and COSTS resulting from the DETENTION of an Insured Person, RELATIVE OR GUEST."

[5] PROPERTY is defined in the Policy as "all real and personal property owned, controlled or leased by the INSURED or for which the INSURED is legally liable including fixtures, fittings, machinery and electronic data processing equipment and other contents."

> transported by, or otherwise in the possession of, the Insured Person, RELATIVE or GUEST so threatened, or is not on the premises where the threat first occurred.
>
> . . .
>
> **DEFINITION OF LOSS**
>
> For the purpose of Hazard 4, <u>LOSS means the sum of monies or the monetary value of any other consideration surrendered</u> by or on behalf of the Insured <u>as an extortion payment</u> arising from one event or connected series of events.

(Emphasis supplied.)

Section III, titled "ADDITIONAL COVERAGE," identifies those circumstances under which additional sums are to be paid in the event an incident is covered by one of the four Hazards. It begins with a preamble:

> The Company shall indemnify the INSURED for the following expenses (Items 1-7) <u>incurred directly and solely as a result of an incident covered by any of the Hazards</u> as shown in Item 3 of the Declarations.[6]

(Emphasis supplied.) Following the preamble are seven types of expenses.

The sixth paragraph, titled "Other Expenses," reads:

> **Other Expenses**: any other reasonable expenses incurred by the INSURED in investigating or paying a LOSS covered by this Policy, including but not limited to:

Beneath "Other Expenses" are letters (a)-(j). Endorsement 5 in Section I amends this list to include (k):

---

[6] The Hazards listed in Item 3 are Hazards 1-4.

6

> [T]he loss of EARNINGS[7] . . . resulting from the necessary interruption of business, <u>caused directly and solely by an incident covered by any of the Hazards</u> . . . up to 120 consecutive days, commencing 6 hours after the actual interruption of EARNINGS up to a maximum Limit of Liability of $10,000,000. any one LOSS. [sic]

(Emphasis supplied.)  Endorsement 6 of Section I "extend[s]" Endorsement 5 to

> [i]nclude the actual loss of EARNINGS sustained by the Named Insured solely and directly as the result of an order by a civil authority to cease, wholly or in part, the Named Insured's business as a result of an extortion threat to damage property contiguous to the Named Insured's premises.

Procedural History

In its June 13, 2016 complaint, USSIC brings three causes of action, seeking a declaratory judgment that: (1) there is no coverage under the Policy because Catalent has not established that Hazard 4, an "EXTORTION PROPERTY DAMAGE," has occurred; (2) there is no "LOSS" as defined under Hazard 4, which requires an extortion payment; and (3) there is no coverage for "Other Expenses" under Section III of the Policy, because coverage under Section II is a necessary trigger to coverage under Section III. Catalent answered on July 20 and filed a counterclaim alleging a breach of contract for failure and refusal to indemnify Catalent for its business interruption loss.  USSIC answered the

---

[7] "EARNINGS" is defined in Endorsement 5 as "net profit plus payroll expenses, taxes, interest, rents and all other operating expenses earned and uncured by the business."

counterclaim on August 13 and moved for judgment on the pleadings on October 7. Catalent cross-moved on October 28. The motions became fully submitted on November 21.

## Discussion

A judgment on the pleadings pursuant to Rule 12(c) is "appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). In deciding such a motion, the court may consider the facts alleged in the complaint as well as "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (citation omitted).

When deciding a Rule 12(c) motion, "we employ the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Thus, the court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." LaFaro v. New York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). "To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege sufficient facts which, taken as true, state a plausible claim for relief." Keiler v. Harlequin Enterprises Ltd., 751 F.3d 64, 68 (2d Cir.

8

2014); see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim has facial plausibility when "the factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).  At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).

While the Policy does not contain a choice of law provision, the parties agree that the Court should apply New York law for purposes of this motion.  Under New York law, insurance contracts are interpreted "to give effect to the intent of the parties as expressed in the clear language of the contract." Ment Bros. Iron Works Co., Inc. v. Interstate Fire & Cas. Co., 702 F.3d 118, 122 (2d Cir. 2012) (citation omitted).  The court should read the integrated contract as a whole in order to determine whether ambiguities exist, and to ensure that undue emphasis is not placed upon particular words and phrases. L. Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010).  "Generally, it is for the insured to establish coverage and for the insurer to prove that an exclusion in the policy applies to defeat coverage." Consol. Edison Co. of N.Y. v. Allstate Ins. Co., 98 N.Y.2d 208, 218 (2002).

9

Section II of the Policy indemnifies Catalent for a "LOSS" as defined by each Hazard. The only relevant Hazard is Hazard 4, "EXTORTION PROPERTY DAMAGE." The elements of a claim under Hazard 4 are (1) a threat[8] (2) of damage to property and (3) an extortion payment.[9]

The parties agree that no "Extortion Property Damage" or "LOSS" as defined in Hazard 4 of the Policy has occurred. USSIC contends there is no coverage under the Policy without "Extortion Property Damage" or "LOSS." Catalent argues that coverage exists because Section III is an independent and "separate insuring agreement."[10]

The "Other Expenses" provisions under Section III of the

---

[8] USSIC argues that the Court should decide on the pleadings that the misplaced capsules, by themselves, cannot constitute a threat. The Policy does not define "threat," but USSIC argues from a definition of the word threat, that misplacement alone does not suffice, because a threat reflects an intent to inflict harm in the future. The facts interpreted most favorably to Catalent demonstrate repeated instances of maliciously misplaced capsules. Catalent has plausibly alleged through its pleadings that this could constitute a threat communicated by conduct, for example, to continue to contaminate Catalent's production lines. Because Catalent is not entitled to coverage for other reasons, however, this question is immaterial.

[9] Moreover, the definition of "LOSS" specific to Hazard 4 requires an extortion payment, which the parties agree has not been made.

[10] Catalent moves as to Counts II and III, but not Count I, which regards ultimate coverage under the Policy, because it acknowledges that the issue as to whether the "out-of-place" capsules constituted a "threat" is a mixed question of law and fact that cannot be resolved at this stage.

Policy do not provide a basis for coverage in the absence of coverage under Hazard 4.  While Section III of the Policy provides "additional coverage" for certain expenses, including business interruption expenses, that coverage is only available if the elements of a claim for a Hazard 4 "LOSS" are present.  This limitation is unambiguous.  It appears in the preamble to Section III and in the other relevant provisions in Section III.  For example, the expenses listed in paragraph 6, which is titled "Other Expenses," together with Endorsements 5 and 6 to the Policy, provide coverage for "reasonable expenses incurred by the INSURED in investigating or paying a LOSS" such as "the loss of EARNINGS . . . resulting from the necessary interruption of business," but limits coverage to a "loss of EARNINGS . . . caused directly and solely by an incident <u>covered by any of the Hazards</u>."  (Emphasis supplied.)

    Thus, the plain language of the Policy is unambiguous that coverage for these additional expenses is predicated on the existence of an event that qualifies as a Hazard 4 event.  Catalent is therefore not entitled to coverage.

    Catalent makes a litany of arguments, none of which succeed in overcoming the unambiguous Policy language that restricts coverage for extortion to those instances in which a payment due to the extortion was made.  The most prominent of Catalent's arguments are addressed below.

11

Catalent argues that Section II (which defines "LOSS") and Section III (which defines other covered expenses) must be independent because the Policy refers to a "LOSS" and other expenses separately in setting forth the time by which a claim must be submitted. The Policy provides that "[w]ritten proof of LOSS and/or expense claim must be furnished to [USSIC] within ninety (90) days after the date of such LOSS and/or expense payment." Catalent reasons from this that an expense claim must be an allowable claim that is independent of a "LOSS" claim. This notice provision merely provides the time period to submit a claim. It does not override the unambiguous language in the Policy regarding the scope of coverage.

Catalent also argues that Section III applies to an "incident covered by any of the Hazards shown in Item 3 of the Declarations," not an incident covered by Section II. This is a distinction without a difference. Item 3 lists the "Hazard[s] Applicable" as only Hazards "1, 2, 3, 4." As described above, without a payment due to an extortionate threat, Catalent has not experienced Hazard 4. Additionally, the category of "Other Expenses" requires that the expenses be incurred in "'investigating' or 'paying' a 'LOSS.'" It is also undisputed that no "LOSS," as defined in the Policy, exists here.

Catalent makes various arguments to the effect that the "loss of EARNINGS" coverage is an enumerated expense, and so it

12

need not conform to the general limitations of the Policy that the incident be covered by a Hazard.  This argument must fail.  A specific subcategory of coverage cannot expand the overall coverage of the Policy.

Catalent argues as well that because it has advanced a reasonable construction of the Policy, it is entitled to judgment on the pleadings.  It is true that, where an insurance contract is ambiguous, the ambiguity must be construed against the insurer.  Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 93 (2d Cir. 2009).  Here, however, the Policy is unambiguous.

## Conclusion

USSIC's October 28 motion for judgment on the pleadings is granted.  The Clerk of Court shall enter judgment for the plaintiff and close the case.

Dated:    New York, New York
          February 24, 2017

```
                    _____
                            DENISE COTE
                    United States District Judge
```